**Bernard SMITH, Petitioner–Appellant,**

v.

**Terry STEWART, Respondent–Appellee.**

No. 97–99006.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 9, 1998.

Decided April 7, 1998.

1264

James M. Ackerman and David B. Earl, Jennings, Strouss & Salmon, Phoenix, Arizona, for petitioner--appellant.

Galen H. Wilkes, Assistant Attorney General, Criminal Appeals Section, Office of Attorney General, Phoenix, Arizona, for respondent--appellee.

Before: FLETCHER, BRUNETTI, and FERNANDEZ, Circuit Judges.

OPINION

FERNANDEZ, Circuit Judge:

Bernard Smith, a death-row prisoner of the State of Arizona, appeals the district court's grant of the state's motion for summary judgment, denial of his motion for summary judgment, and denial of his petition for a writ of habeas corpus. We affirm in part, reverse in part, and remand.

BACKGROUND

Unfortunately for the good citizens of Arizona, Smith went to Yuma in April of 1983, shortly after he was paroled from prison in California. Within a few months, he had committed three armed robberies of convenience stores. Then, on August 21, 1983, shortly before midnight, he entered the Low Cost Market in Yuma, pointed a gun at the store clerk, Charles Pray, and said, "Give me all of the money or I will blow your fucking head off." Pray, instead, called out his manager's name twice, whereupon Smith raised his gun and shot his hapless victim. Smith then cleaned out the cash register, ran from the store, encountered Ellen Foster and her sister in their car, and ordered them to go. He then jumped into his own car, but the sisters followed him for blocks and got his license plate number. The police stopped his car within a short time and discovered him, a revolver, and a roll of blood-stained bills.

Upon his arrest, Smith appeared to be in fine physical and mental condition. He offered up a cock-and-bull story about picking up a hitchhiker, who must have been the owner of the gun and the booty, at an intersection close to the store. That story fell apart when he discovered that Ellen Foster had followed his car from the store right through the intersection and had seen that he did not pick anyone up. Nothing daunted, Smith developed a new defense.

Now, it seems, the real story was that Al Johnson had come to Yuma to talk to Smith about manufacturing PCP. After holding their business meeting, Smith and Johnson went to the Low Cost Market in Smith's car, after which Smith went in and exited peacefully. Johnson then went in and shot the

clerk. After that, Johnson left his gun and the booty in Smith's car and left Smith.

Smith's victim suffered egregious wounds, but lingered on in pain and fear for a couple of weeks when he finally died from his injuries.

Smith's prosecution for this offense then commenced, he was found guilty by a jury, and was sentenced to death by the trial judge in accordance with Arizona's capital case procedures. He appealed, and in *State v. Smith*, 146 Ariz. 491, 707 P.2d 289 (1985) (*Smith I*), the Arizona Supreme Court affirmed both his conviction and his sentence. He then brought a series of post-conviction relief petitions in the state courts, and after the third of those was decided adversely to him, he proceeded with the present habeas corpus action in the federal courts. The district court, as we have said, denied the writ and he appealed.

## JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C. § 2254. We have jurisdiction pursuant to 28 U.S.C. § 1291.

█ We review grants of summary judgment de novo. *See Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir.1994). We also review a district court's decision to grant or deny a § 2254 petition de novo. *See Moran v. McDaniel*, 80 F.3d 1261, 1268 (9th Cir.1996). However, we accord a presumption of correctness to factual findings made by a state court and we accept state court rulings on state law questions. *See id.*

## DISCUSSION

We have been presented with a long list of jeremiads about the state pretrial proceedings, the state trial proceedings, the state sentencing proceedings, the state appellate proceedings, and, finally, the district court proceedings.

We have considered all of the claims, and find virtually all of them to be without merit. Thus, while it might seem to be out of the normal order of things, we will first turn to the only truly troubling aspect of this case;

the aspect which requires habeas corpus relief. That is Smith's claim that he was denied effective assistance of counsel at his death penalty presentencing hearing.[1] We will only then turn to the other issues, and will dispose of them with less spilling of ink.

### A. Sentencing Proceedings

It is undisputed that trial counsel presented no mitigating evidence at the presentencing hearing and, more than that, he essentially presented no argument on Smith's behalf. Counsel made a few asthenic comments to the effect that Smith still denied his guilt and that he was just 30 years of age. Nothing else!

█ We must decide whether counsel was ineffective based on the now familiar factors set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to obtain relief, Smith must show both that counsel "was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment," and that the deficiency prejudiced him. *Id.* at 687, 104 S.Ct. at 2064.

█ The first factor requires the defendant to show "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. And in determining whether it did, we must be "highly deferential," avoid "the distorting effects of hindsight," and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065.

█ The second factor requires that counsel's errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. at 2064. That in turn means that there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. And that in turn means that the unprofessional errors were egregious enough "to undermine confidence in the outcome." *Id.; see also United States v. Span*, 75 F.3d 1383, 1387 (9th Cir.

---

1. We note that counsel in the proceeding before us were not counsel at Smith's trial.

1996); *Clabourne v. Lewis,* 64 F.3d 1373, 1378 (9th Cir.1995).

▮ Of course, all of these rules apply to the death penalty phase of a prosecution. *Strickland* itself was a murder prosecution, and the Supreme Court did apply its rules to the death penalty part of the case. *See* 466 U.S. at 698–701, 104 S.Ct. at 2070–71; *see also, Clabourne,* 64 F.3d at 1378.

### (1) *Representation*

▮ When we apply the first factor of the analysis to the case at hand, we are virtually compelled to determine that trial counsel was not effective. As we have said, counsel presented no evidence at the penalty phase and virtually no argument. We recognize that the mere failure to present evidence at sentencing, as troubling as that may be on its face, does not result in a per se finding of ineffectiveness. *See Darden v. Wainwright,* 477 U.S. 168, 185–87, 106 S.Ct. 2464, 2473–74, 91 L.Ed.2d 144 (1986); *Mak v. Blodgett,* 970 F.2d 614, 618 & n. 6 (9th Cir.1992). But when no deficiency has been found, the failure to present evidence has been based upon tactical considerations. When the grounds have not been based upon tactical considerations, we have not hesitated to find deficient performance. *See Hendricks v. Calderon,* 70 F.3d 1032, 1043–44 (9th Cir.1995), *cert. denied,* 517 U.S. 1111, 116 S.Ct. 1335, 134 L.Ed.2d 485 (1996) (decision to plead for mercy not based on strategy); *Clabourne,* 64 F.3d at 1387 (counsel's despair not enough where the case was not a lost cause); *Evans v. Lewis,* 855 F.2d 631, 637 (9th Cir.1988) (failure to investigate and to present any evidence of mitigation was not tactical).

▮ In the case at hand, counsel did not perform any real investigation into mitigating circumstances, even though that evidence was rather near the surface. No tactical reason is given for that failure. At the postconviction hearing, counsel did testify that he had spoken with Smith, and Smith's mother, but that he had received no information. Counsel also spoke generally with Smith about his growing up years, but did not discover any difficulties worth mentioning, and does not recall having been made aware of any treatment Smith might have received at a medical facility. We are well aware of the fact that counsel cannot be expected to have an afflatus through which he conjures up a wonderful story, without the help of his client. Indeed, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. And both strategic decisions and investigation may well depend on "information supplied by the defendant." *Id.* Nevertheless, the record before us indicates that counsel asked nothing more than a few generalized questions and conducted none of the real probing for information that legal praxis assumes and even demands. We simply cannot find any reason, tactical or otherwise, for the failure of counsel to develop any mitigation evidence at all for the purpose of defending Smith against the death penalty. We now know that counsel could have, at least, pointed to Smith's sociopathic personality, his bad drug history, his change in personality after a large drug overdose, and his fine set of family relationships at the time. Counsel could also have alluded to Smith's love for his children and his support of them.

We do not say that any of the above considerations were so powerful that they must have led to a life sentence rather than to a sentence of death. But we can see no justification for counsel's failure to present evidence or argument on Smith's behalf. Even if no great amount of additional evidence were developed, counsel could have at least presented some argument based upon the presentence report. That report reflected a personality problem, which to a somewhat trained eye looks sociopathic; prior drug use; good family relationships; and the existence of Smith's children. As we see it, the failure to even attempt to persuade the sentencing judge, through evidence or argument, that he should grant Smith leniency " 'amount[ed] in every respect to no representation at all.' " *Clabourne,* 64 F.3d at 1387 (citations omitted). Thus, counsel was not effective, but was the result prejudicial? We think so, as we will explain.

### (2) *Prejudice*

▮ Arizona's death penalty sentencing scheme requires a sentencing judge to order

the death penalty, if there are any aggravating circumstances and "no mitigating circumstances sufficiently substantial to call for leniency." *See* Ariz.Rev.Stat. § 13–703(E). Here, there could be no doubt that there were aggravating circumstances. Thus, it was particularly critical that an attempt be made to present and argue mitigating circumstances. *See Evans*, 855 F.2d at 637. To put it starkly, counsel's failure was a virtual admission that the death penalty should be imposed upon his client. Counsel could hardly have been deluded into thinking that he could deflect that inexorable result by merely stating that his client still denied guilt and was 30 years of age. The situation fairly bristles with prejudice, but we must proceed with some caution because Smith still bears the burden of showing that "confidence in the outcome" has been undermined. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

In assessing prejudice in a case like this one, we are presented with a particularly difficult practical and jurisprudential question because we are not asked to imagine what the effect of certain testimony would have been upon us personally. We are asked to imagine what the effect might have been upon a sentencing judge, who was following the law, especially one who had heard the testimony at trial. Mitigating evidence might well have one effect on the sentencing judge, without having the same effect on a different judicial officer. For example, we now know that Smith has a sociopathic personality. The Arizona Supreme Court has made it clear that an antisocial personality disorder (sociopathic disorder) is a mitigating factor, even if it does not come up to the level of a factor specifically listed in the Arizona sentencing statute. *See State v. Thornton*, 187 Ariz. 325, 334–35, 929 P.2d 676, 685–86 (1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1706, 137 L.Ed.2d 831 (1997); *see also State v. Stokley*, 182 Ariz. 505, 521–22, 524, 898 P.2d 454, 470–71, 473 (1995), *cert. denied*, 516 U.S. 1078, 116 S.Ct. 787, 133 L.Ed.2d 737 (1996). Thus, there can be no doubt that the trial court must consider that personality defect when it is present in a case. Yet, that factor has often been treated on appeal as insufficient to justify mitigation. *See, e.g., State v. Brewer*, 170 Ariz. 486, 505, 826 P.2d 783, 802 (1992). Thus, sociopathy might appear sufficiently mitigating to a sentencing judge in some circumstances, but not seem so to other judges in the same or different circumstances.

The sentencing judge must, after all, make the initial life or death decision, and his judgment will stand if it is supportable. Reviewing courts, at least on habeas corpus, conduct their review to see if the decision can be supported, rather than to see if they would have reached the same decision. When faced with a case like this one, where no evidence was offered and no argument was made on behalf of the defendant, the reviewing court's task is that much harder, but must still be discharged. Again, that is especially true where, as here, the failure to offer evidence or make argument amounts to a concession that the death penalty should be imposed, and an abandonment of the client to that fate. Our obligations and analyses are well illuminated by three of our cases, of which two are very recent.

In *Clabourne* counsel had developed some mental defect evidence at trial, but did not further develop the evidence at sentencing. He presented no evidence or relevant argument, even though there was some hope for his client. We found prejudice. *See* 64 F.3d at 1387. In *Correll v. Stewart*, 137 F.3d 1404 (9th Cir.1998), we also faced a case where counsel essentially failed to present any mitigating evidence or, it seems, any substantial argument. *See id.* at 1412. We found that both ineffective assistance and prejudice were sufficiently set forth to require an evidentiary hearing. *See id.* at 1412–13. Similarly instructive is *Gerlaugh v. Stewart*, 129 F.3d 1027 (9th Cir.1997), where counsel did present mitigating evidence. *See id.* at 1033–36. However, the defendant alleged that counsel failed to present a forceful enough argument for leniency. *See id.* at 1036. We disagreed, but in so doing we carefully considered the claim that the failure to plead for his client's life was, in fact, ineffective assistance. *See id.* at 1036–43. We pointed out that counsel had argued for his client's life with great vigor, and that in light of Gerlaugh's " 'shockingly evil and grossly bad' " conduct, "no plea for mercy or leniency ... indeed no oral argument" could

have saved him. *Id.* at 1042. Even at that, one judge on the panel dissented. *See id.* at 1045–52 (Reinhardt, J., dissenting). Again, the seriousness of our task when counsel has done nothing at all is manifest.

We have applied ourselves to that task and must now conclude that Smith was prejudiced by trial counsel's failure to present mitigating evidence or argument on his client's behalf. We have already pointed out that Smith's sociopathic personality defect is a factor in mitigation, but the issue was neither developed by evidence nor argued to the sentencing judge. Similarly, Smith's long use of drugs is a factor that could have had a mitigating effect. *See, e.g., State v. Gallegos,* 178 Ariz. 1, 17, 870 P.2d 1097, 1113 (1994). As with a personality defect, it can be so, even if it does not rise to the level of a listed statutory mitigating factor. *See Stokley,* 182 Ariz. at 523, 898 P.2d at 472. We pause to mention that the issue regarding Smith's antisocial personality and his long-term use of drugs is not whether those precluded him from knowing right from wrong, as the post sentencing court and the district court seem to have assumed. They would have to come up to that level to meet a statutorily listed mitigating circumstance. *See* Ariz.Rev.Stat. § 13–703(G)(1). They need not do so in order to be non-listed mitigators. Along the same line, a major personality change can amount to a mitigating factor in Arizona. *See State v. Rockwell,* 161 Ariz. 5, 15–16, 775 P.2d 1069, 1079–80 (1989). Smith has presented some evidence that a change of that nature came over him after he had ingested a large amount of PCP in 1980. Counsel did not discover or follow up on that possibility. Of much less significance is Smith's argument that he did not really preplan the killing of his victim. Given the sentencing judge's comments upon the method of the killing in question, this factor seems weak indeed. The court stated that Smith was "fully prepared and intending to kill if his demands were not complied with instantly," and said that he had "coldly and deliberately murdered the victim...." Still and all, an alternate picture of a typical armed convenience store robbery, which went awry when the victim yelled for his boss rather than handing over the money, was a possible one to paint for the sentencing

judge under the facts of this case. *Cf. Harris v. Dugger,* 874 F.2d 756, 763–64 (11th Cir.1989). Counsel's failure to even attempt to convince the sentencing judge of this alternate reality may itself have helped to foster the finding in question. Finally, Smith points to his good family relationships. That was before the sentencing judge through the presentence report, but in a very mild form. With a little effort it could have been developed through evidence or argument, and could have put Smith himself in a somewhat different light.

Again, we recognize that these factors, even as now developed, do not demand a life sentence rather than a sentence of death. On the other hand, while the facts of this case are bad enough to disturb even a jaded observer, they do not reach the level of those in cases where the aggravating facts were so overwhelmingly horrifying that it was highly improbable that mitigating factors of any ordinary stripe would help. *See, e.g., Gerlaugh,* 129 F.3d at 1042–43; *Bonin v. Calderon,* 59 F.3d 815, 836 (9th Cir.1995), *cert. denied,* 516 U.S. 1051, 116 S.Ct. 718, 133 L.Ed.2d 671 (1996); *Campbell v. Kincheloe,* 829 F.2d 1453, 1464 (9th Cir.1987). We also recognize that a post-conviction court in Arizona has heard this evidence, and was not moved. Had the judge who heard the post-conviction proceeding also been the trial and sentencing judge, we would be considerably less inclined to order relief for that might at least approach a "looking-glass exercise in folly." *Gerlaugh,* 129 F.3d at 1036; *but cf. Clabourne,* 64 F.3d at 1387. As it turned out, it was a different judge.

In fine, after deep consideration and with all due respect to those who have heard this case before us, our confidence in the sentencing result has been undermined. The writ must issue.

### B. *Other Sentencing Issues*

Even though Smith's purpose in killing his victim was to quickly get money from the cash register at the convenience store, Smith attacks the sentencing court's finding that he killed the victim for pecuniary gain. We find no merit in that argument. *See, e.g., State v. Gonzales,* 181 Ariz. 502,

513, 892 P.2d 838, 849 (1995), *cert. denied,* 516 U.S. 1052, 116 S.Ct. 720, 133 L.Ed.2d 673 (1996); *State v. Ross,* 180 Ariz. 598, 605, 886 P.2d 1354, 1361 (1994), *cert. denied,* 516 U.S. 878, 116 S.Ct. 210, 133 L.Ed.2d 142 (1995). He also argues that the impact of the crime upon his victim was considered, but that impact went to the cruelty factor, which was stricken by the Arizona Supreme Court. *See Smith I,* 146 Ariz. at 504, 707 P.2d at 302. Thus, he can show no prejudice. His claim that considering the impact of the death on the victim's family violated his constitutional rights also fails. *See Payne v. Tennessee,* 501 U.S. 808, 828–30 & n. 2, 111 S.Ct. 2597, 2610–11 & n. 2, 115 L.Ed.2d 720 (1991); *Gretzler v. Stewart,* 112 F.3d 992, 1009 (9th Cir.1997) *cert. denied,* — U.S. —, 118 S.Ct. 865, 139 L.Ed.2d 763 (1998). At any rate, in Arizona the judge is the sentencer and can separate the wheat from the chaff. *See id.; State v. Spears,* 184 Ariz. 277, 292, 908 P.2d 1062, 1077 (1996), *cert. denied,* — U.S. —, 117 S.Ct. 393, 136 L.Ed.2d 308 (1996); *State v. Beaty,* 158 Ariz. 232, 244, 762 P.2d 519, 531 (1988). Nor does Smith's assertion that the Arizona Supreme Court could not reweigh the sentencing factors have a particle of merit. *See Jeffers v. Lewis,* 38 F.3d 411, 415–16 (9th Cir.1994). Finally, entirely otiose is Smith's shotgun blast of claims that his sentence was unconstitutional because Arizona does not properly narrow the class of death penalty recipients; Arizona's proportionality review (or lack thereof) is improper; sentencing judges do not have proper guidance; imposition of the death penalty under the statute is mandatory; the prosecutor can decide whether to seek the death penalty; the death penalty, in gross and as applied to Smith, constitutes cruel and unusual punishment; Smith was entitled to a jury trial on the sentencing issues; and the beyond a reasonable doubt standard was not applied. We reject them all.

### C. *State Pretrial and Trial Issues*

#### (1) *General Assertions*

 Smith asserts that his constitutional rights were violated when the trial court did not grant him a continuance to seek processing of a neutron activation test, which the prosecution had not pursued because the sample taking had been botched. The purpose of the test would have been to see if Smith had any powder residue on his hands, which would be an indication of whether he had fired a gun. However, he does not point to a portion of the record in, which that motion was made, and the record does show that counsel did not even intend to pursue the test. As counsel explained, the test could have sunk Smith's defense that he did not commit the murder, and Smith himself did not want a continuance for that purpose. We are at a loss to see any error in this respect.

 Smith also claims that he should have been given a continuance so that counsel could adequately prepare to counter evidence regarding other convenience store robberies that Smith had perpetrated, and regarding ammunition that had been seized from Smith's home. However, beyond the general amorphous statement that counsel was unable to prepare to defend, Smith does not show how he was unfairly prejudiced. We see nothing in the record to convince us that he was. *See Brecht v. Abrahamson,* 507 U.S. 619, 637–38, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993); *Walton v. Arizona,* 497 U.S. 639, 656, 110 S.Ct. 3047, 3058, 111 L.Ed.2d 511 (1990). In a somewhat similar vein, Smith asserts that his identification by witnesses of the other robberies and testimony about the similarity of the commands the robber gave should not have been admitted at all. But, of course, because Smith was making a mistaken identification claim, the evidence was surely relevant and its admission was not a due process violation. If it were a state law evidentiary error, and we do not see that it was, that was not a basis for federal habeas corpus relief. "[I]t is not the province of a federal habeas corpus court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991). That is what Smith wants us to do. We decline his invitation, and also decline his further invitation to reflect upon the relevance of the ammunition found at his house, except to say that it was relevant enough to avoid presenting any federal constitutional question.

Smith then argues that his *Brady* [2] rights were violated because counsel had not been informed that the police had heard about a rumor in the community to the effect that Smith's brother was in the car with him, but that Smith himself had gone into the store to commit the robbery. No doubt under *Brady* the state had the obligation to disclose favorable evidence to Smith. *See United States v. Bagley,* 473 U.S. 667, 674–75, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985). However, it is pretty difficult to see how the information was favorable. If it were, it was so weak, so remote, and so inconclusive that it is highly unlikely that it would have had any effect whatever upon the verdict, much less would it "undermine confidence in the outcome" of the trial. *Id.* at 682, 105 S.Ct. at 3383; *see also Carriger v. Stewart,* 132 F.3d 463, 479 (9th Cir.1997) (en banc). [3]

### (2) *Ineffective Assistance of Counsel*

In another group of claims, Smith asserts that his trial counsel was ineffective because of a number of errors that he allegedly committed. We disagree, and will briefly say why. Smith first asserts that counsel was ineffective because he "allowed" the trials for Smith's armed robberies of other convenience stores to go to trial before this murder case. We think not. Had counsel rushed this case to trial with inadequate preparation, we would now be regaled with a claim that he was ineffective for that reason. Moreover, the other cases probably had priority because they were, actually, committed earlier and started sooner. And Smith does not show that his counsel could have manipulated the system so as to force this case to trial first. In fact, the post-conviction court was not convinced that he could have done so, and so held. On the other hand, we recognize that counsel did not give sufficient attention to the potential impact of the other robbery cases on this murder case. Those convictions were later used to impeach Smith and were used as two of the aggravating factors underlying his death sentence. At any rate, even if an element of ineffectiveness were shown (assuming that a single timing error in a well-presented trial would render counsel ineffective), Smith cannot show prejudice because he would still have been left with an aggravating circumstance—pecuniary gain. *See* Ariz.Rev.Stat. § 13–703(F)(5).

Smith also argues that counsel failed to track down his will-o'-the-wisp witness, Al Johnson, a person whom Smith accused of committing the crime after Smith's first story fell apart. As the post-conviction court pointed out, the Al Johnson story was pretty suspicious, and, more than that, Smith did not give counsel much of a clue as to where Johnson could be found. More than that, trial counsel, as a matter of strategy, was much happier with having Johnson as an empty chair to which he could point, without facing the danger of refutation, etc. Smith, along the same lines, complains that his trial counsel was the first to mention that Johnson was in town to talk Smith into a drug deal, and that Smith had prior convictions for drug offenses. But that was both the heart of the Johnson story and a way of drawing the sting from any impeachment of Smith with those crimes when he testified. There are many ways to be effective, and we must resile from present counsel's attempt to lure us into the hindsight miasma that the Supreme Court has told us to avoid. *See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

In another magnificent display of hindsight, present counsel asks us to fault trial counsel for failing to force an excited,

---

**2.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**3.** Smith would like to have argued still two more issues to us: that a photo of the victim should not have been admitted at trial, and that the prosecutor made an improper opening argument. However, the district court properly held that those claims were procedurally barred. *See Martinez–Villareal v. Lewis,* 80 F.3d 1301, 1305–06 (9th Cir.), *cert. denied,* —— U.S.——, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996). His further argument that the Antiterrorism and Effective Death Penalty Act changes this result is a wallydrag. Chapter 153 of the Act does not apply because Smith's case was commenced before its enactment. *See Lindh v. Murphy,* —— U.S. ——, ——, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997); *Jeffries v. Wood,* 114 F.3d 1484, 1494 (9th Cir.) (en banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 586, 139 L.Ed.2d 423 (1997). Chapter 154 of the Act does not apply because Arizona does not meet its strictures. *See Lindh,* —— U.S. at ——, 117 S.Ct. at 2063.

upset, ill child to take the witness stand, when the purport of her exculpatory evidence was already before the jury. Trial counsel saw no real advantage in that; nor do we.

 And, we are told that trial counsel should have had a neutron activation test performed, even though Smith did not want it, and even though it could have (in hindsight probably would have) sunk Smith's case. Instead, trial counsel carried on about the prosecution's failure to have the test performed. Of course, he knew that the reason for the failure was that the samples were collected improperly. Well, counsel can listen to his client and often should. *See Campbell,* 829 F.2d at 1463. And Smith still does not tell us what the results of the test would have been. *See United States v. Hamilton,* 792 F.2d 837, 839 (9th Cir.1986). Those results may well have been just as devastating as counsel (and, perhaps, Smith) feared they would be.

 As a closing shot, Smith attacks counsel's closing argument because, he says, counsel's description of reasonable doubt was not perfect. Perhaps it was not, but perfection is not required. Counsel did not tell the jury that it should not apply the reasonable doubt standard in judging his client. *Cf. United States v. Swanson,* 943 F.2d 1070, 1074–75 (9th Cir.1991). In fact, Smith can only make his claim by mischaracterizing what his trial counsel said. Counsel was not deficient and did not prejudice his client.[4]

### CONCLUSION

We affirm the district court and turn aside Smith's attacks on his conviction and sentence in most respects. However, although he had leal counsel for his trial on the merits of the prosecution against him, he was denied effective assistance at sentencing when no mitigating evidence or argument was presented on his behalf. Given the facts of this case, the nature of Arizona's sentencing laws, and the extent of counsel's failure at sentenc-

ing, our confidence in the outcome of that proceeding has been undermined. Thus, we reverse the district court's denial of habeas corpus in that respect and remand with directions that it issue a writ releasing Smith from the sentence of death and directing that he be resentenced. Of course, we express no opinion on what the sentence should be.

AFFIRMED in part, REVERSED and REMANDED in part.

---

4. Finally, Smith aims his attack on direct appeal counsel and on post-conviction counsel. He attacks the former because counsel did not file kitchen-sink briefs with the Arizona courts. But that is not necessary, and is not even particularly good appellate advocacy. *See Jones v. Barnes,* 463 U.S. 745, 750–54, 103 S.Ct. 3308, 3312–14, 77 L.Ed.2d 987 (1983); *Pollard v. White,* 119

F.3d 1430, 1435 (9th Cir.1997); *Miller v. Keeney,* 882 F.2d 1428, 1434 (9th Cir.1989). As to the latter, Smith has no right to counsel on post-conviction proceedings, much less effective counsel. *See Coleman v. Thompson,* 501 U.S. 722, 752, 111 S.Ct. 2546, 2566, 115 L.Ed.2d 640 (1991); *Bonin v. Vasquez,* 999 F.2d 425, 430 (9th Cir.1993).