**Stephen JACKSON Jr., aka Stephen Jackson, aka Khidr Omowale, Petitioner,**

v.

**Tom FELKER, Respondent.**

**Case No. CV 07–3982–GAF(RC).**

United States District Court, C.D. California.

July 23, 2010.

---

Stephen Jackson, Susanville, CA, pro se.

John Yang, CAAG–Office of Attorney General of California, Los Angeles, CA, for Respondent.

## ORDER ADOPTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE AND ORDER DENYING CERTIFI-CATE OF APPEALABILITY

GARY A. FEESS, District Judge.

Pursuant to 28 U.S.C. Section 636, the Court has reviewed the petition and other papers along with the attached Report and Recommendation of United States Magistrate Judge Rosalyn M. Chapman, as well as petitioner's objections, and has made a *de novo* determination.

IT IS ORDERED that (1) the Report and Recommendation is approved and adopted; (2) the Report and Recommendation is adopted as the findings of fact and conclusions of law herein; and (3) Judgment shall be entered denying the petition and dismissing the action with prejudice.

This Court finds an appeal would not be taken in good faith, and petitioner has not made a substantial showing that he has been denied a constitutional right, for the reasons set forth in the Report and Recommendation of the United States Magistrate Judge, and accordingly, a certificate of appealability should not issue under 28 U.S.C. § 2253(c)(2) and Fed. R.App. P. 22(b). *Slack v. McDaniel,* 529 U.S. 473, 483, 120 S.Ct. 1595, 1604, 146 L.Ed.2d 542 (2000); *Mayfield v. Calderon,* 229 F.3d 895, 900 (9th Cir.2000). Thus, IT IS FURTHER ORDERED that a Certificate of Appealability be DENIED.

FINALLY, IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order, the Magistrate Judge's Report and Recommendation and Judgment by the United States mail on petitioner.

## JUDGMENT

Pursuant to the Order of the Court adopting the findings, conclusions, and recommendations of United States Magistrate Judge Rosalyn M. Chapman,

IT IS ADJUDGED that the petition for writ of habeas corpus is denied and the action is dismissed with prejudice.

## REPORT AND RECOMMENDATION OF A UNITED STATES MAGISTRATE JUDGE

ROSALYN M. CHAPMAN, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Gary A. Feess, United States District Judge, by Magistrate Judge Rosalyn M. Chapman, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05–07 of the United States District Court for the Central District of California.

## BACKGROUND

### I

On May 24, 2005, in Los Angeles County Superior Court case nos. BA270867 and BA277842, a jury convicted petitioner Stephen Jackson Jr., aka Stephen Jackson, aka Khidr Omowale, of five counts of forcible rape in violation of California Penal Code ("P.C.") § 261(a)(2) (counts 1, 4, 5, 14 & 19), one count of sexual penetration with

a foreign object in violation of P.C. § 289(a)(1) (count 2), three counts of forcible oral copulation in violation of P.C. § 288(c)(2) (counts 3, 6 & 7), one count of sodomy by use of force in violation of P.C. § 286(c)(2) (count 8), one count of attempted forcible rape in violation of P.C. § 664/261(a)(2) (count 17); as to counts 1–4, the jury found petitioner personally used a dangerous or deadly weapon in violation of P.C. § 12022(b)(1); as to counts 1–8, 14 and 19, the jury found petitioner committed an offense specified in P.C. § 667.61(c) against more than one victim; and, as to count 19, the jury found petitioner personally used a firearm within the meaning of P.C. § 12022.53(b). Clerk's Transcript ("CT") 280–97. The petitioner was sentenced to life with the possibility of parole, with a minimum term of 70 years plus a determinate term of 13 years. CT 298–302, 316–21.

The petitioner appealed his convictions and sentence to the California Court of Appeal, CT 303, which affirmed the judgment in an unpublished opinion filed March 14, 2007. Lodgment, Exhs. B–C & JJ–KK. On March 29, 2007, petitioner, proceeding through counsel, filed a habeas corpus application in the California Court of Appeal, which denied the application on April 13, 2007. Lodgments FF & GG. On April 17 and 18, 2007, petitioner filed petitions for review in the California Supreme Court, challenging the affirmance of his conviction and the denial of his habeas petition, and on June 13, 2007, the petitions were denied. Lodgment, Exhs. D–E & P–Q. On October 12, 2007, petitioner, proceeding pro se, filed a petition for writ of certiorari in the United States Supreme Court, which denied the petition on January 7, 2008, Lodgments HH & II; *Jackson v. California*, 552 U.S. 1108, 128 S.Ct. 892, 169 L.Ed.2d 745, and denied rehearing on March 31, 2008. *Jackson v. California*, 552 U.S. 1305, 128 S.Ct. 1763, 170 L.Ed.2d 557 (2008).

After petitioner's conviction became final,[1] petitioner filed numerous pro se habe-

---

1. Before petitioner's judgment became final, petitioner filed numerous pro se habeas corpus petitions in the state courts, including the following: (1) On August 1, 2006, petitioner filed a habeas corpus petition in the California Supreme Court, which denied the petition on February 14, 2007, with citations to *In re Lessard*, 62 Cal.2d 497, 503, 42 Cal.Rptr. 583, 399 P.2d 39 (1965), and *In re Dixon*, 41 Cal.2d 756, 264 P.2d 513 (1953), Lodgment, Exhs. F–G; (2) on October 23, 2006, petitioner filed another habeas corpus petition in the California Supreme Court, which denied the petition on April 18, 2007, with citation to *In re Clark*, 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993), Lodgment, Exhs. H–I; (3) on October 26, 2006, petitioner filed another habeas corpus petition in the California Supreme Court, which denied the petition on April 18, 2007, again with citation to *In re Clark*, 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993), Lodgment, Exhs. J–K; (4) on November 9, 2006, petitioner filed a habeas corpus petition in the California Court of Appeal, which denied the petition on November 17, 2006, Lodgment, Exhs. X–Y; (5–7) on November 14, 2006, petitioner filed three more habeas corpus petitions in the California Court of Appeal, which denied the petitions on November 17, 2006, Lodgment, Exhs. Z–EE; (8) on December 4, 2006, petitioner filed another habeas corpus petition in the California Supreme Court, which denied the petition on April 18, 2007, with citation to *In re Clark*, 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993), Lodgment, Exhs. L–M; (9) on December 5, 2006, petitioner filed a habeas corpus petition in the Los Angeles County Superior Court, which denied the petition on April 17, 2007, Lodgment, Exhs. LL–MM; (10) on March 29, 2007, petitioner filed another habeas corpus petition in the California Court of Appeal, which denied the petition on April 13, 2007, Lodgment, Exhs. FF–GG; (11) on April 13, 2007, petitioner filed another habeas corpus petition in the California Supreme Court, which denied the petition on August 22, 2007, Lodgment, Exhs. N–O; (12) on July 2, 2007, petitioner filed another habeas corpus petition in the California Supreme Court, which denied the petition on October 31, 2007, Lodgment, Exhs. R–S; (13) on July

as corpus petitions in the California courts, including (at least) the following petitions in the California Supreme Court:[2] (15) on April 14, 2008, petitioner filed a habeas corpus petition in the California Supreme Court (case no. S162625), which denied the petition on September 17, 2008, with citations to *In re Clark*, 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993), *In re Waltreus*, 62 Cal.2d 218, 42 Cal.Rptr. 9, 397 P.2d 1001 (1965), and *In re Miller*, 17 Cal.2d 734, 112 P.2d 10 (1941); (16) on April 18, 2008, petitioner filed a habeas corpus petition in the California Supreme Court (case no. S162782), which denied the petition on July 9, 2008, with citation to *In re Dexter*, 25 Cal.3d 921, 160 Cal.Rptr. 118, 603 P.2d 35 (1979); (17) on June 12, 2008, petitioner filed a habeas corpus petition in the California Supreme Court (case no. S164278), which denied the petition on July 9, 2008, with citation to *In re Dexter*, 25 Cal.3d 921, 160 Cal.Rptr. 118, 603 P.2d 35 (1979); (18) on June 25, 2008, petitioner filed a habeas corpus petition in the California Supreme Court (case no. S164636), which denied the petition on July 30, 2008, with citation to *In re Dexter*, 25 Cal.3d 921, 160 Cal.Rptr. 118, 603 P.2d 35 (1979); (19) on July 14, 2008, petitioner filed a habeas corpus petition in the California Supreme Court (case no. S165071), which denied the petition on July 30, 2008; (20) on February 12, 2009, petitioner filed a habeas corpus petition in the California Supreme Court (case no. S170572), which denied the petition on May 20, 2009; (21) on April 2, 2009, petitioner filed a habeas corpus petition in the California Supreme Court (case no. S171651), which denied the petition on May 20, 2009; (21–22) on April 6, 2009, petitioner filed two habeas corpus petitions in the California Supreme Court (case nos. S171746 and S171754), which denied both petitions on May 20, 2009, denying the latter petition with citations to *In re Clark*, 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993), *In re Robbins*, 18 Cal.4th 770, 780, 77 Cal.Rptr.2d 153, 959 P.2d 311 (1998), and *In re Swain*, 34 Cal.2d 300, 304, 209 P.2d 793 (1949); (23) on April 27, 2009, petitioner filed a habeas corpus petition in the California Supreme Court (case no. S172386), which denied the petition on May 20, 2009, with citation to *In re Miller*, 17 Cal.2d 734, 112 P.2d 10 (1941); (24) on May 4, 2009, petitioner filed a habeas corpus petition in the California Supreme Court (case no. S172584), which denied the petition on June 10, 2009; (25) on May 11, 2009, petitioner filed a habeas corpus petition in the California Supreme Court (case no. S172811), which denied the petition on June 24, 2009; (26) on June 1, 2009, petitioner filed a habeas corpus petition in the California Supreme Court (case no. S173331), which denied the petition on September 9, 2009, with citation to *In re Miller*, 17 Cal.2d 734, 112 P.2d 10 (1941); (27) on July 7, 2009, petitioner filed a habeas corpus petition in the California Supreme Court (case no.

---

23, 2007, petitioner filed another habeas corpus petition in the California Supreme Court, which denied the petition on January 16, 2008, with citations to *In re Swain*, 34 Cal.2d 300, 304, 209 P.2d 793 (1949), and *In re Dexter*, 25 Cal.3d 921, 160 Cal.Rptr. 118, 603 P.2d 35 (1979), Lodgment, Exhs. T–U; and (14) on November 19, 2007, petitioner filed yet another habeas corpus petition in the California Supreme Court, which denied the petition on May 14, 2008, with citations to *In re Clark*, 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993), *In re Miller*, 17 Cal.2d 734,

112 P.2d 10 (1941), *In re Swain*, 34 Cal.2d 300, 209 P.2d 793 (1949), *People v. Duvall*, 9 Cal.4th 464, 474, 37 Cal.Rptr.2d 259, 886 P.2d 1252 (1995), *In re Waltreus*, 62 Cal.2d 218, 42 Cal.Rptr. 9, 397 P.2d 1001 (1965), and *In re Dixon*, 41 Cal.2d 756, 264 P.2d 513 (1953). Lodgment, Exhs. V–W, VV.

**2.** Given petitioner's numerous filings, the Court does not set forth any petitions filed in the California Court of Appeal or Los Angeles County Superior Court.

S174438), which denied the petition on July 29, 2009, with citation to *In re Clark,* 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993); (28) on July 29, 2009, petitioner filed a habeas corpus petition in the California Supreme Court (case no. S175034), which denied the petition on November 19, 2009, with citations to *In re Robbins,* 18 Cal.4th 770, 780, 77 Cal. Rptr.2d 153, 959 P.2d 311 (1998), *In re Miller,* 17 Cal.2d 734, 112 P.2d 10 (1941), *In re Lindley,* 29 Cal.2d 709, 177 P.2d 918 (1947), and *In re Dixon,* 41 Cal.2d 756, 264 P.2d 513 (1953); (29) on August 6, 2009, petitioner filed a habeas corpus petition in the California Supreme Court (case no. S175280), which denied the petition on September 9, 2009; (30) on September 8, 2009, petitioner filed a habeas corpus petition in the California Supreme Court (case no. S176153), which denied the petition on November 19, 2009, with citations to *In re Robbins,* 18 Cal.4th 770, 780, 77 Cal. Rptr.2d 153, 959 P.2d 311 (1998), and *In re Miller,* 17 Cal.2d 734, 112 P.2d 10 (1941); (31) on September 28, 2009, petitioner filed a habeas corpus petition in the California Supreme Court (case no. S176639), which denied the petition on October 28, 2009; (32) on October 14, 2009, petitioner filed a habeas corpus petition in the California Supreme Court (case no. S177106), which denied the petition on November 10, 2009, with citation to *In re Dexter,* 25 Cal.3d 921, 160 Cal.Rptr. 118, 603 P.2d 35 (1979); and (33) on March 16, 2010, petitioner filed a habeas corpus petition in the California Supreme Court (case no. S181036), which denied the petition on April 14, 2010.

## II

The California Court of Appeal made the following findings of fact regarding the circumstances underlying petitioner's crimes:[3] Lee D. testified that on March 26, 2004, she took a train from Union Station and exited at another station to transfer her ticket, but had difficulties purchasing a ticket from the machines. Petitioner approached her and told her that he could show her where she could purchase a ticket. She followed him for a distance of approximately one block, leaving the Metro station and ending up in a parking garage. In the stairwell there, petitioner removed her jacket with rough force and told her to take off her pants. She refused, and he held a screwdriver close to her face and said he did not want to hurt her. As she pleaded for petitioner to stop, he pulled off her pants, shoes, and underwear, and complimented her body. He placed his finger and his penis in her vagina, then demanded oral sex. Lee refused, and he then forced her to perform oral sex by poking her in the neck with the screwdriver. He then penetrated her vagina again with his penis. Petitioner stopped when they heard voices; Lee grabbed for her clothes, put them on, and went up the stairs toward the exit, with petitioner following her up the stairs and tugging on her jacket. At the exit, petitioner ran away. Lee identified Jackson from a photographic lineup and in court.

Ellie R. testified that petitioner attacked her in a Union Station stairwell on July 16, 2004. He threw her against a wall, covered her mouth with her hand when she tried to scream, told her to shut up, and forced her to the ground. Petitioner pinned her down and displayed a gun, which caused her to stop fighting back out of fear. Petitioner ripped Ellie's clothes off, put his penis in her vagina, kicked her as she lay on the landing, and left her there. Ellie identified petitioner as her attacker at the preliminary hearing and at trial. DNA recovered from Ellie's vagina matched petitioner's DNA.

Dernisha R. testified that on July 22, 2004, petitioner accosted her in a stairwell

---

**3.** Lodgment, Exh. C at 10–12.

at Union Station, grabbed her buttocks, lifted her skirt, ripped off her panties, pinned her down, straddled her, and began unbuckling his pants. She screamed, kicked him in the face, and escaped him after a struggle. Dernisha identified petitioner as the assailant in a live lineup and in court.

Latoya S. testified that she met petitioner on a subway train on September 1, 2004. She told him that she was going to sell her bus pass for money to purchase marijuana. He told her that he sold marijuana, so they agreed that once she sold her bus pass she would buy the marijuana from him. Latoya was unable to sell her bus pass, and petitioner said he would just give her the marijuana. Petitioner led them to a Union Station parking structure stairwell, where they smoked some of the marijuana. Latoya then accompanied petitioner to an area near Union Station where he retrieved some additional marijuana, which he gave to her. They boarded another subway train and exited at a different station; Latoya remained with petitioner because he promised her more marijuana. He led her to a parking structure at the Los Angeles Central Library, where he ripped her shirt open, told her he had a gun, and instructed her to remove all her clothes. Jackson then put his penis into her vagina. He heard someone approach, pulled Latoya to the side of the stairs, and he continued to try to have intercourse with her. A security guard approached and told them to leave; Latoya did not tell the guard that she was being raped because she was scared. Petitioner took her by the arm and led her to the street, where she broke away and ran to a taxi. A sexual assault examination of Latoya revealed injuries consistent with blunt force trauma occurring during a sexual assault, and were not consistent with engaging in consensual sex. Latoya identified petitioner as the assailant in a photographic lineup.

Ashley H. testified that while she was changing trains at Union Station on September 2, 2004, petitioner approached her and asked her to be a look-out while he purchased marijuana. She agreed, and they went to the parking structure, where petitioner dragged her to a secluded area. Petitioner ripped off her clothes, removed his clothes, and then penetrated her anus with his finger and penis. Petitioner then placed his penis in her vagina multiple times, orally copulated her, forced her to orally copulate him, urinated on her, and forced her to remain naked to discourage her from fleeing. Petitioner kept her there for more than three hours. Ashley gave him marijuana that she had in her purse and agreed to leave the parking structure for the ostensible purpose of buying a marijuana cigarette. On the street, Ashley saw a police car and ran in front of it, causing the car to stop. She told the police that petitioner had raped her. Petitioner was arrested. Ashley identified petitioner at the preliminary hearing and at trial.

### III

On June 20, 2007, petitioner filed the pending habeas corpus petition under 28 U.S.C. § 2254 challenging his convictions and sentence.[4] On June 25, 2007, the

---

4. Before filing the pending habeas corpus petition, however, petitioner had filed numerous habeas corpus petitions which were dismissed without prejudice because petitioner's state criminal conviction was not yet final or petitioner had not yet exhausted his state court remedies, as follows: (1) *Jackson v. Deputy Dist. Atty Mark Beaart,* case no. CV06–6581– GAF(RC), which was dismissed without prejudice on December 1, 2006; (2) *Jackson v. Los Angeles Police Dept.,* case no. CV 05–2914– GAF(RC), which was dismissed without prejudice on April 29, 2005, under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); (3) *Jackson v. Los Angeles Police*

Court found the petition did not comply with Rule 2(a) of the Rules Governing Section 2254 Cases in District Courts and dismissed it with leave to amend, and on July 16, 2007, petitioner filed an amended habeas corpus petition. On July 24, 2007, the Court found the amended habeas corpus petition was indefinite and did not comply with Rules 2(c) and (d) and dismissed the amended petition with leave to amend, and on September 20, 2007, petitioner tardily filed a Second Amended Petition. On February 29, 2008, the Court found the Second Amended Petition was a "mixed" petition containing both exhausted (Grounds One through Three and Six) and unexhausted (Grounds Four and Five) claims,[5] and afforded petitioner the opportunity to dismiss the unexhausted claims and proceed on the exhausted claims, and the Court granted his request to dismiss the unexhausted claims. The respondent answered the petition on May 15, 2008, and petitioner filed a reply on June 9, 2008.

The pending petition contains the following claims:

Ground One—The trial court violated petitioner's "right of self representation several times, by allowing stand by counsel to represent [petitioner] while [petitioner] was in propria persona representation";

Ground Two—The Superior Court violated petitioner's constitutional rights when it twice denied his request to continue the trial because Los Angeles County Sheriffs "took all of [petitioner's] legal property during pre-trial and wouldn't allow [petitioner] to obtain law library access";

Ground Three—"The trial court erred in allowing juror no. 12 to serve on the panel, after his admittance [sic] of being an employee at the Union Station Plaza (Amtrak)"; and

Ground Six—Petitioner's convictions are manifestly unjust because he "was falsely convicted" and the trial court and prosecution "obstructed justice" in petitioner's case. Second Amended Petition at 5–7.

## DISCUSSION

### IV

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "circumscribes a federal habeas court's review of a state court decision." *Lockyer v. Andrade,* 538 U.S. 63, 70, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003); *Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 2534, 156 L.Ed.2d 471 (2003). As amended by AEDPA, 28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—[¶] (1)

---

*Dept.,* case no. CV 05–5429–GAF(RC), which was dismissed without prejudice on August 9, 2005, for failure to exhaust state court remedies; (4) *Jackson v. Los Angeles County Sheriff's Dept.,* case no. CV 06–2997–GAF(RC), which was dismissed without prejudice on June 5, 2006, for failure to exhaust state court remedies; (5) *Jackson v. House,* case no. CV 06–5784–GAF(RC), which was dismissed without prejudice on September 22, 2006, for failure to exhaust state court remedies; and (6) *Jackson v. Abrahamian,* case no. CV 06–6049–GAF(RC), which was dismissed without prejudice on October 13, 2006, for failure to

exhaust state court remedies. As of January 1, 2007, this Court determined petitioner was a vexatious litigant due to his abuse of the writ.

5. The unexhausted Grounds Four and Five were: (4) The trial court asserted bias and prejudice during petitioner's trial, most evident during jury selection, petitioner's trial testimony and at sentencing; and (5) petitioner's due process rights were violated when the prosecutor admitted there was no DNA evidence.

resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or [¶] (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Further, under AEDPA, a federal court shall presume a state court's determination of factual issues is correct, and petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

In determining whether a state court's decision is either "contrary to" or an "unreasonable application" of clearly established federal law, this Court must examine the last reasoned state court decision. *Pinholster v. Ayers*, 590 F.3d 651, 662 (9th Cir.2009) (en banc); *Smith v. Curry*, 580 F.3d 1071, 1079 (9th Cir.2009), *pet. for cert. filed*, 78 USLW 3523 (Feb. 12, 2010). Where no state court has provided a reasoned decision addressing the merits of a habeas petitioner's claims, this Court must conduct "an independent review of the record" to determine whether the California Supreme Court's ultimate denial of those claims was contrary to, or an unreasonable application of, clearly established federal law. *Pinholster*, 590 F.3d at 663; *Valdovinos v. McGrath*, 598 F.3d 568, 576 (9th Cir.2010). Finally, "[d]e novo review, rather than AEDPA's deferential standard, is applicable to a claim that the state court did not reach on the merits." *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir.2004); (en banc); *Cone v. Bell*, —— U.S. ——, 129 S.Ct. 1769, 1784, 173 L.Ed.2d 701 (2009).

# V

## Procedural History

The California Court of Appeal, in affirming petitioner's conviction, made the following findings regarding the procedural history of petitioner's criminal proceedings:

[Petitioner] was alleged to have sexually assaulted five women near Union Station in Los Angeles between March and September 2004. [Petitioner's] original counsel, the alternate public defender, declared a conflict, and a panel attorney was appointed for [petitioner] on February 28, 2005, in case No. BA270867. At a March 1, 2005 pretrial conference, new counsel, Arlene Binder, requested a continuance of the March 25 trial date so that she could prepare for trial. [Petitioner] opposed his counsel's request because he wanted a speedy trial. The trial judge, Judge Sam Ohta, granted a continuance until March 11, 2005, for attorney Binder to familiarize herself with the case and determine exactly how much preparation time she required.

[¶] When the parties returned on March 11, Binder requested that the case be continued to May 2, 2005, so that she could prepare and have DNA analyses performed. Judge Ohta observed that this appeared to be a reasonable request supported by good cause, and asked [petitioner] for his view. [Petitioner], apparently upset that his first attorney had declared a conflict, told the court "[T]here is some trickery that is coming into play to delay this situation by Mr. Abrahamian [the first attorney], you know, the conflict of interest without me knowing about it in the first place just occurring and now we're delaying and delaying. I don't want to delay because I know I'm innocent and I want it to just happen. And I'm not going to waive any[ ]more time. If today was the day to start the pretrial, I will still say I want it today. I didn't want it back two weeks ago. I'm not going to waive no more time." The trial court granted the continuance. [¶] On April 25, 2005, with

Binder as his counsel, [petitioner] was arraigned on an amended information in his other pending case, No. BA277842. At that hearing, [petitioner] attempted to address the court but was directed to confer with his counsel. After some time, Judge Ohta said, "Mr. Jackson, I'm going to give you a form. It's called a Faretta [6] motion. You need to go over that form, and on May 2nd you may make that request if that's your desire at that point." [Petitioner] responded, "I can't make it today?" The court said, "You have to think about it and go over it."

[¶] [Petitioner] continued, "I mean, I already went pro per on another case in December. I even have the forms with me now. I understand I still have pro per status at L.A. County Jail; so I understand the process. And I would like to go pro per right now and have this ready for my signature and go forward with the procedure." The court reiterated, "I'm not doing it today." [¶] [Petitioner] insisted, "It's my right, my Faretta rights to do this. I'm not giving attitude or nothing. But at this moment I can—it's my right to go pro per. It's my right." The court said, "It's your right to go pro per when we have a court proceeding for you to go pro per. You do not have a court proceeding for you to go pro per." [Petitioner] said, "I'm positive this time I want to go pro per. It's my right and I can go pro per right now. It's my right. I understand that, too. I don't have to wait until May 2nd. I know this. I know it." The court told [petitioner] that they had finished his case for the day and that they would hear his motion at the next court hearing. [¶] At the next court hearing, on May 2, 2005, the first matter was [petitioner's] desire to represent himself. Judge Ohta commented, "I had given

him a form. He does not appear to have a form in his hand. Well, first of all speak to your attorney about what you want to do." [Petitioner] said that all of his papers were confiscated by sheriff's deputies. The court directed that a new *Faretta* waiver form be provided to [petitioner]. The court then turned to the prosecutor's allegation that [petitioner] had been contacting the victims directly by letter and telephone to dissuade them from testifying. The court informed [petitioner] that regardless of whether he had counsel or was representing himself, he could not contact the victims directly. The court then engaged in a lengthy advisement to [petitioner] of the advantages of having counsel and the disadvantages he would face by representing himself. The court told [petitioner] that "[t]hese charges are quite complicated. These charges are complicated for attorneys to handle because they involve[ ] many different rules of law and how they might interplay in connection with proving up the case. [¶] "Many attorneys disagree as to how the law should be interpreted because some of these laws are fairly new. You are not even a licensed attorney. I'm not saying that you're not smart or that you're not bright, but even smart bright people sometimes don't comprehend fully what these laws mean or say. You are telling me that you wish to embark upon this journey of representing yourself where you are looking at an indeterminate term of life imprisonment, possibly consecutive 5 separate instances alleged against you. [Five] possible consecutive life sentences, and you are telling me that you want to represent yourself in this case?" [Petitioner] responded, "Yes." The court directed him to consult further with his

**6.** *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (*Faretta* ).

counsel, and gave him approximately one-half hour to do so. [P]etitioner continued to want to represent himself. [¶] Judge Ohta engaged in an extended discussion with [petitioner] about representing himself, offering additional advisements about the disadvantages of representing himself within the context of this case. [Petitioner] reaffirmed his desire to represent himself. The court found that [petitioner] was "freely and voluntarily" waiving his right to an attorney and allowed him to represent himself. [¶] Proceeding on to other pretrial issues, [petitioner] did not oppose the consolidation of the two cases against him. The court consolidated the two cases. The next matter discussed was the trial date. The day of the hearing, May 2, was designated 0 of 15, and the trial court told [petitioner] that he had a right to go to trial by May 17. The court asked whether [petitioner] wanted to have the trial within that 15[-]day window. [Petitioner] responded, "Ms. Binder said the DNA experts don't have the information back until, like, May 31st. So I mean if I get it, I still want my speedy trial, due process rights. Would that mean I'll be giving up by waiting until the 31st?" [¶] The court told [petitioner] that he would have to decide whether to have the trial within 15 days or to wait until the information came back from the DNA expert. [Petitioner] asked, "Yes, so if I waive time today, I lose control of what I'm doing; right?" The court responded, "No, you don't lose control of what you're doing. You lose control to the extent that you don't get your trial on the date that you originally had it set

for. So the next court date becomes 0 of whatever you agree with the prosecutor." "So what do you want to do?" the court asked. [Petitioner] said, "I am not going to waive time." The court ensured that [petitioner] understood that he was in effect electing to forego his DNA expert: "If you do not waive time, you will go to trial by May 17. That means jurors will be selected[,] the prosecution will begin to call witnesses by May 17[,] that will happen. Which means that if the information from the expert is not available until the 31st this case probably will be done by then. So you'll be finished before the expert is available. Do you understand?" [Petitioner] responded affirmatively and repeated, "I don't want to waive time." The trial court appointed Binder as stand-by counsel,[7] ordered a legal runner, and awarded pro per funds to [petitioner]. [¶] On May 12, 2005, [petitioner] reiterated that it was his desire that the matter go to trial. Judge Ohta asked, "So you want me to send this case to Department 100 tomorrow?" [Petitioner] said yes, and the court ordered the matter assigned to Department 100 for trial. [¶] The following day, Judge David Wesley called the matter for trial. The court asked [petitioner] if he was ready for trial. [Petitioner] said, "I need a continuance." The court asked, "Did you file a motion to continue?"

[Petitioner] said that he did not. The court asked the grounds for the continuance, and [petitioner] answered, "Ever since I went on pro per back at the County facility, I haven't been had—

---

7. "Standby counsel refers to the situation where a pro se defendant is given the assistance of advisory counsel who may take over the defense if for some reason the defendant becomes unable to continue." *United States v. Mendez–Sanchez,* 563 F.3d 935, 946 (9th Cir.) (citation and internal quotation marks omitted), *cert. denied,* — U.S. ——, 130 S.Ct. 252, 175 L.Ed.2d 172 (2009); *United States v. Salerno,* 81 F.3d 1453, 1456 n. 2 (9th Cir.), *cert. denied,* 519 U.S. 982, 117 S.Ct. 436, 136 L.Ed.2d 333 (1996).

haven't had access to the law library for like two weeks and haven't been able to get in contact with my private investigator due to the fact that I haven't been able to use the phones." [¶] When the court asked if [petitioner] had declared that he was ready for trial the day before, [petitioner] admitted that he had done so. The court asked, "What happened between yesterday and today?" [Petitioner] said, "I've been contemplating a lot." The trial court denied the motion for a continuance and sent the matter to Judge Bob Bowers, Jr. for trial. [¶] The parties moved to Judge Bowers's courtroom, where [petitioner] again complained that he had not been able to use the law library or the telephone to contact his investigator. The court asked why he had told the prior department that he was ready for trial, and [petitioner] said that he had told the prior department that he was not ready, "but they didn't grant it, so I'm asking you again." The court asked if Judge Wesley had explained why he denied a continuance, and [petitioner] said, "He just said he won't. But I'm asking again because I do need it because I haven't been able to use the facility to exercise my pro per rights." The court said that he was bound by the other court's ruling, and said that if [petitioner] told all this to the other department, then no continuance would be granted. At this point the prosecutor asked to be heard and told the court that he was concerned about appellate review of the case, as it was complicated, [petitioner] had been pro per for only a short time, he had not filed a particular motion, and he had waived his DNA experts. The court asked if the prosecutor had made this argument before Judge Wesley, and the prosecutor responded that he had tried to, but had been sent out before he could do so. The court ordered a recess because "I have to satisfy myself on some

issues." [¶] When the court reconvened, the court said, "I have checked with Department 100 in this matter. And basically as I was sort of hinting at at our first encounter this morning is that apparently you insisted on not waiving time and announcing ready to go to trial. I believe that Ms. Binder was about to make a motion in that regard, or something in essence in that regard, and was told not to, or wasn't acknowledged. [¶] So consequently we are at this point in this matter, this matter will go to trial." [¶] After the court and the parties discussed a number of matters, including the start of jury selection the following court session, [petitioner] announced that he wanted to give up his pro per status. The court said that he would appoint Binder as [petitioner's] counsel, but that even if she took over his representation the trial was going to begin. [Petitioner] said, "So, in other words, I still have a chance? Even though I continue to represent myself, I can still get my status after I pick a jury?" The court explained that he wanted [petitioner] to make a final decision over the weekend about whether to represent himself: "[W]hen you leave here today I'm asking you to prepare a witness list if that's what you want to do, and you come in here Monday and you let me know what you decided, if you are going to keep on representing yourself or have Ms. Binder come in and represent you." [Petitioner] asked a moment later, "So if I get my counsel back, Ms. Binder, we can continue this matter?" The court said, "No. That's what I said about five minutes ago.... What we're really talking about is: One, this trial is going to start on Monday. That's going to start, okay? So anything we're talking about right now is who is going to do the talking." [¶] [Petitioner] responded, "Yeah. So no resources, no law library,

but on Monday it has to be done. Either I do it or she does it and that's it?" The court answered, "Well, I mean, again, that's your phraseology of it. Hear me out. I don't agree with it but that's acceptable. All right?" [Petitioner] said, "But no continuance by me or her?" The court repeated that there would be no continuance because "nobody forced" [petitioner] to declare that he was ready for trial. [¶] Binder requested to be heard by the court. She said, "I would like to make a record that I feel there's some very, very strong reasons why (A) he should not be representing himself; and (B) due to a possible competency-in-understanding issue." The court said that at the advanced stage of the proceedings, it was "not in a position to go behind and evaluate his suitability for pro per status." The court observed that when defendants seek to go pro per their competence is evaluated and stated on the record, "And as far as I'm concerned at this point that will have to suffice until there is further evaluation by some other court." Binder told the court that the information she wanted to share with the court had come to her only the day before. The court said, "That's what I'm saying. [¶] And again, Ms. Binder, what you say to me is not unreasonable. But what I am saying to you is pro pers want to go into pro per status and if these issues come up the court assumes these issues will be raised by the pro pers. And again I appreciate what you are trying to do but it's just not appropriate[ ] at this point in time. In other words, I can't have you advocate for certain positions for your client at this point and be stand-by counsel."

[¶] Judge Bowers called the case the following Monday morning, May 16, 2005, outside [petitioner's] presence, so that Binder could address the court in the presence of the prosecutor. She presented a letter to the court from [petitioner's] childhood friend, and told the court, "Before when I was still his counsel I was just at the point where I was going to ask the court for appointment of a psychiatrist; not because I felt he had psychological problems to the point that it could be [incompetence within the meaning of Penal Code section] 1368—although I was concerned about that—I have since spoken with his mother at length and some people very recently and also psychological professionals that tell me the symptoms I describe could possibly be indicative of the onset of schizophrenia. [¶] "It would be my opinion that when he became pro per that he was not fully comprehending what that in fact meant. He didn't understand that he most likely would not get pro per privileges in the law library because he had written letters to victims in this case, and I believe that's the reason[,] it would be my guess[,] why they are not allowing him to use the law library. [¶] "I felt the reason why we're here at this stage—and I don't know when he comes out if he's going to say that he wants me to take over or not—but the reason we're here I believe is because he did not comprehend what it means to be—anything about this process and waiving time, etcetera. And I'm very concerned, gravely concerned about his psychological status." [¶] The trial court responded that it was not the court that decided that [petitioner] was competent to represent himself and that he did previously announce that he was ready for trial. "It seems to me that he is somewhat aware of what is going on. Maybe he was making a ploy to find out if the people were ready and if they weren't ready what might have happened. I don't know that. [¶] But what I do know [is] it came out here for trial." The court said, "Again, I don't know

how long this case has been in the system or how long you represented him before he was granted pro per status—but it seems to me that what you suggest seems to me there should have been some indication prior to ten days, before he announced ready to go to trial. And it's this court's observation—again, I don't profess to be a medical professional at all—but it is this court's observation in the very limited time that I have seen him is that he elected to make this choice. [¶] And he's not the first person that's ever done this. It just rushes on them right away that it's really going to trial. And that's how he seems to be." [¶] [Petitioner] entered the courtroom and told the court that he wanted to continue to represent himself. [¶] After jury selection and opening statements, [petitioner] told the court that he wanted stand-by counsel to take over the case. Binder took over the representation and immediately began to raise the issue of [petitioner's] competency again. She acknowledged that [petitioner's] behavior could be seen as abusing the system but said, "On the other hand, I have continued to have conversations with a gentleman who has explained to me certain facts regarding [petitioner's] behavior over the past several years. And the court did get an opportunity to review a letter that I presented to the court. And I received further information indicating that [petitioner] was—had a group of life-long friends." The court said that these issues should have been raised prior to trial and that "[Petitioner] has appeared to me to be a reasonably articulate and intelligent man. He has made some decisions and things here that actually have been—as far as the court is concerned—have been no more than appropriate." [¶] Binder continued to press: "The two points I would like to make is this information did not even begin to

come to me until last Friday, and further over the weekend." She said, "I think the question is this: When somebody assumes pro per status, and I myself in my dealings with [petitioner] he most often appeared very intelligent, I know he has college in his background—" [¶] The trial court interrupted. "I've told you this for the second time: I am not a psychologist. And I'm telling you from my experience as a bench officer watching people in the courtroom—lawyers, non-lawyers—I see nothing, absolutely nothing to distinguish this man from any other person who has attempted to represent himself, or represented himself, or to act a part in any proceedings in the courtroom."

[¶] Counsel persisted, "I understand the court does not see that. But I ask the court to consider whether this is just a person—at what point do we distinguish between a person who is pro per and makes certain decisions based on bad judg[ ]ment or stupidity or whatever, or based on the possible in[c]ipience of a mental illness." The trial court said, "I think that something is going to be taken up on appeal. The bottom line is there is no—nothing in the record to indicate there is any kind of mental disorder whatsoever that would prevent him from taking part in his own defense. [¶] As I indicated before, to the point that he said he no longer wanted to be his own attorney, there was nothing in this court's opinion that indicated at all that there was any kind of mental impairment that would prevent him from taking part. And that's just as I see it from the bench." [¶] Binder asked, "Is the court discounting the information on the letter presented?" The court responded, "That was some childhood friend who made observations, not a physician. This is just somebody that's tantamount to me saying hypothetically

if I was to see Mr. Beaart [the prosecutor] and say I think he's crazy. I have no basis for that. I'm not a physician. That's just somebody that observed him. That's their opinion. I don't know who this person is, or was, I don't know what the basis was for coming to those conclusions that person came to. [¶] I recognize—I did read the letter, I understand what it means. But it has no meaning or significance in terms of this court's rulings with respect to his mental capacity to take part in these proceedings." [¶] The trial court then denied Binder's requests for a continuance, and the trial resumed.

Lodgment, Exh. C at 2–10 (footnotes added, footnote omitted).

### Ground One

In Ground One, petitioner claims he was denied his right to self-representation when standby counsel was allowed to represent petitioner while petitioner was exercising his *Faretta* rights and was representing himself. SAP at 5. Ground One focuses on the pretrial hearing held outside petitioner's presence on May 16, 2005, in which standby counsel voiced concern about petitioner's competency and presented a letter from petitioner's "close childhood friend." [8] *Id.* Among other things, petitioner claims this letter "defamed [his] character and ... was possibly forged by standby counsel." *Id.*

■ In *Faretta*, the Supreme Court held "an accused has a Sixth Amendment right to conduct his own defense, provided only that he knowingly and intelligently forgoes his right to counsel and that he is able and willing to abide by rules of procedure and courtroom protocol." *McKaskle*

*v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); *Faretta,* 422 U.S. at 834–35 & n. 46, 95 S.Ct. at 2541 & n. 46. "But *Faretta* did not recognize an unqualified right for *pro se* defendants to stand alone in a courtroom. Instead, the Supreme Court allowed states to appoint 'standby counsel' to aid *pro se* defendants 'if and when [they] request[ ] help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." *Frantz v. Hazey,* 533 F.3d 724, 739 (9th Cir.2008) (en banc) (quoting *Faretta,* 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46). Moreover, under *Faretta,* "no absolute bar on standby counsel's unsolicited participation is appropriate or was intended." *McKaskle,* 465 U.S. at 176, 104 S.Ct. at 950. Rather, "*Faretta* allows standby counsel sometimes to participate without violating an individual's right to self-representation." *Frantz,* 533 F.3d at 739; *McKaskle,* 465 U.S. at 177, 104 S.Ct. at 950.

■ Nevertheless, there are "some limits on the extent of standby counsel's unsolicited participation" in order to protect the Sixth Amendment's right to self-representation:

First, the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury. This is the core of the *Faretta* right. If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak instead of the defendant on any matter of importance,

---

8. Petitioner also briefly references other alleged instances of violations of his right to represent himself, *see* SAP at 6; however, these complaints really challenge the trial court's appointment of standby counsel, the trial court's sidebar discussion with standby counsel about the limitations of her role, and the trial court's explanation of standby counsel's role to petitioner, which are without merit for the reasons set forth herein.

the *Faretta* right is eroded. [¶] Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself. The defendant's appearance in the status of one conducting his own defense is important in a criminal trial, since the right to appear pro se exists to affirm the accused's individual dignity and autonomy.

*McKaskle*, 465 U.S. at 177–78, 104 S.Ct. at 950–51 (footnote omitted); *Frantz*, 533 F.3d at 739. However, "[p]articipation by standby counsel outside the presence of the jury engages only the first of these two limitations." [9] *McKaskle*, 465 U.S. at 179, 104 S.Ct. at 951; *Frantz*, 533 F.3d at 739. "Thus, *Faretta* rights are adequately vindicated in proceedings outside the presence of the jury if the pro se defendant is allowed to address the court freely on his own behalf and if disagreements between counsel and the pro se defendant are resolved in the defendant's favor whenever the matter is one that would normally be left to the discretion of counsel." *McKaskle*, 465 U.S. at 179, 104 S.Ct. at 951.

■ Here, standby counsel did not interfere with any of petitioner's tactical decisions regarding how to present his case to the jury.[10] Rather, outside of the jury's presence, standby counsel raised the issue of petitioner's competence with the trial court, who rejected standby counsel's concerns and allowed petitioner to continue pro se. Thus, standby "counsel's partic-

ipation outside the presence of the jury" did not violate petitioner's constitutional rights, *McKaskle*, 465 U.S. at 179, 104 S.Ct. at 951, and the California Supreme Court's denial of this claim was neither contrary to, nor an unreasonable application of, federal law.

**Ground Two**

In Ground Two, petitioner claims his constitutional rights were violated when his requests to continue his trial were denied by the Superior Court although Los Angeles County Sheriffs had taken petitioner's property before the trial and would not allow him law library access. There is no merit to this claim.

The California Court of Appeal, in affirming petitioner's conviction, rejected this claim, stating:

[Petitioner] asserts that Judge Wesley erred in denying [petitioner's] request for a continuance when the parties appeared in Department 100 to be sent out for trial, and that Judge Bowers erred by denying counsel's request for a continuance when she took over the case from [petitioner] after opening statements. We find it extremely troubling that [petitioner] went to trial with an attorney who believed herself to be unprepared to try his case. We are also concerned that a pro per defendant who in fact appears to have had no library or telephone privileges was treated as if he had an opportunity to prepare his defense. Given the circumstances under

---

9. This is because the trial judge, who is charged with supervising the protection of a *pro se* defendant's *Faretta* right throughout the trial, "must be considered capable of differentiating the claims presented by a pro se defendant from those presented by standby counsel." *McKaskle*, 465 U.S. at 179, 104 S.Ct. at 951. "Accordingly, the appearance of a pro se defendant's self-representation will not be unacceptably undermined by counsel's

participation outside the presence of the jury." *Id.*, 104 S.Ct. at 951.

10. For instance, prior to relinquishing his *pro se* status, petitioner actively engaged in jury selection, including exercising peremptory challenges and arguing several jurors should be excused for cause, and gave an opening statement. *See* Augmented Reporter's Transcript ("ART") at 1:21–192:22; Reporter's Transcript ("RT") 100:6–101:6.

which each continuance request was made, however, we cannot conclude that either Judge Wesley or Judge Bowers abused his discretion in refusing the requested continuances. We consider each request in turn. [¶] Continuances in criminal cases are granted only upon a showing of good cause. The trial court has broad discretion to determine whether good cause exists, but that discretion "may not be exercised so as to deprive the defendant or his attorney of a reasonable opportunity to prepare." " 'A showing of good cause requires a demonstration that counsel and the defendant have prepared for trial with due diligence.' " [¶] At the time that [petitioner] made his request for a continuance before Judge Wesley, he had consistently pursued a path to bring his case to trial as quickly as possible. Only one day earlier, [petitioner] had declared that he wanted the case sent to Judge Wesley for assignment to a trial court. He had rejected all continuances offered to him, insisting on his speedy trial rights even when that meant foregoing possibly exculpatory evidence (the DNA analysis). But when the parties appeared before Judge Wesley the day after [petitioner] declared he was ready for trial, it became apparent that he would have to proceed to trial immediately, and the delays that he so strenuously opposed in the past became attractive. On that day, for the first time, [petitioner] disclosed to Judge Wesley that he had not had access to telephones or the library for the duration of his self-representation in this matter. [¶] While it is distressing that this pro per defendant appears to have lacked access to resources with which to prepare a defense, it is also evident that [petitioner] failed to raise this denial in a timely manner and continued to push his case forward despite his inability to prepare for trial. He was obviously aware of his

lack of readiness for trial on May 12 but nonetheless said that day that he wanted his case sent out for trial. [Petitioner] was unable to identify any change in circumstance that would account for him reporting that he was ready to proceed on May 12 but needed a continuance on May 13. Nothing had changed, except that he had been "contemplating." While Judge Wesley, upon learning that [petitioner] had not been able to prepare his defense, could very reasonably have granted the requested continuance, it was also reasonable to conclude that [petitioner] had not demonstrated due diligence in preparing for trial. The trial court reasonably could have determined that eleventh-hour contemplation is not good cause for a day-of-trial continuance and that [petitioner's] sudden about-face was a strategic plan that backfired when the prosecution was in fact ready to proceed despite having only a short time to prepare. [¶] When Binder took over representing [petitioner] after a jury had been empaneled and opening statements delivered, she requested a continuance to allow her to prepare for trial. The court refused, explaining, "You've had a reasonable time to prepare[;] in a sense you're much different than normal stand-by counsel. And even if you had not had the time, you were counsel before this began. You have been continuously with him since this thing began. [¶] And, lastly, again, he assumed the status ten days before he announced ready for trial. I don't see any prejudice to you or Mr. Jackson when you are coming in at this point in time. In other words, you didn't come in at the last minute, you don't have to get familiar with the paperwork, or whatever. But here's where we are at this point. [¶] And the bottom line is I see no prejudice whatsoever to Mr. Jackson by your assuming the case at this point in time;

again, with less than a ten day time frame when he was given pro per status and the time he came to [Department] 105 [for trial]." [¶] Binder corrected Judge Bowers—she was not [petitioner's] original counsel, but had been appointed at the end of February, approximately two and one-half months earlier. Moreover, she had not been expecting to go to trial for some time. From the pretrial proceedings that had taken place before Judge Ohta, counsel would not have anticipated going to trial until the DNA analysis had been completed, as she had already obtained one continuance for the DNA analysis to be performed, and she presumably would have been able to obtain another continuance for that purpose had [petitioner] not elected to go pro per at the May 2 hearing. [¶] Judge Bowers acknowledged Binder's points but did not change his view. Binder then requested a continuance to await the DNA analysis, and the court denied that request as well because [petitioner] had already elected to proceed without having that evidence in order to expedite his trial. [¶] Although it would have been extremely reasonable to grant Binder a continuance, the trial court did not abuse its discretion when it denied this request. A trial court has great latitude in deciding whether to grant a continuance once trial has begun. " ' "The granting or denial of a motion for continuance in the midst of a trial traditionally rests within the sound discretion of the trial judge who must consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion. In the lack of a showing of an abuse of discretion or of prejudice to the defendant, a denial of

his motion for a continuance cannot result in a reversal of a judgment of conviction.' " Entitlement to a midtrial continuance requires the defendant 'show he exercised due diligence in preparing for trial.' " [¶] As the trial court observed, Binder had been [petitioner's] counsel until just over 10 days before trial when [petitioner] went pro per, and remained involved with the matter as stand-by counsel, attending all court proceedings after [petitioner] began representing himself. [Petitioner] did not relinquish his pro per status until after the trial had begun, but he had been vacillating enough about representation that Binder, although she remained stand-by counsel, was on notice that she could be called in to take over the case at any moment. Given the burden a continuance would have imposed on witnesses, jurors and the court, and the fact that counsel had been on the case for some time before the less-than-two-week period that [petitioner] acted in pro per, it was not unreasonable for the trial court to deny Binder's request for a continuance to prepare for trial. [¶] With respect to the second ground for a continuance, waiting for the DNA analysis, the trial court did not abuse its discretion in refusing the continuance on that basis. While representing himself, [petitioner] had already elected to proceed to trial without this evidence rather than to accept a continuance to await it. Based on [petitioner's] decision to go to trial instead of waiting for the DNA evidence to be available, the case was sent out to a trial department, a jury was empaneled, and witnesses summoned. It was not unreasonable to hold [petitioner] to the consequences of his earlier decision by refusing to grant newly reappointed counsel a continuance to wait for the DNA evidence. [¶] Even if either judge should have granted the

requested continuance, we must conclude that any such error was harmless in light of the abundant evidence of [petitioner's] guilt. Each victim identified [petitioner] as her assailant; DNA matching his DNA was recovered from the vagina of one of the victims, Ellie R.; and he was arrested while still in the company of and immediately following the assault on Ashley H. [Petitioner] has not demonstrated a reasonable probability of a different outcome had the requested continuances been granted.

Lodgment, Exh. C at 20–24 (citations omitted).

■■■ "The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel." *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964). Whether the denial of a continuance deprives a defendant of due process "must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Id.* at 589, 84 S.Ct. at 850; *see also Morris v. Slappy*, 461 U.S. 1, 11–12, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983) ("[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." (citation omitted)).

Here, as the California Court of Appeals found, when petitioner appeared before Superior Court Judge Sam Ohta on May 2, 2005, he exercised his right to represent himself and refused to waive time, and Judge Ohta informed petitioner that this meant he would go to trial no later than May 17, 2005. RT 1A:14–19A:1. Subsequently, when Judge Ohta arraigned petitioner on an amended information on May 12, 2005, petitioner reiterated his desire to proceed to trial. ART C–1:11–C–5:25. However, when petitioner appeared before Superior Court Judge David S. Wesley the next day, he requested a continuance, claiming he had not had access to the law library or contact with his private investigator because he had been denied the use of the telephones.[11] ART D–1:27–D–2:14. When the Superior Court judge asked petitioner why he had announced he was ready for trial the day before and now was seeking a continuance a day later, petitioner merely stated that "[he'd] been contemplating a lot" and gave no other reason. ART D–2:15–26.

On May 13, 2005, when petitioner appeared before Superior Court Judge Bob S. Bowers, Jr., he again requested a continuance because he had not been able to use the library or contact his investigator,

11. According to the prosecutor, petitioner was denied access to the law library because he had been writing and telephoning his victims to persuade them not to testify against him:

> Three victims in this case received handwritten letters from [petitioner] through jail mail. They stated, essentially, his resume. They stated the names of the other victims, their addresses, and their phone numbers within the handwritten letter and attempted to disway [sic] them for [sic] testifying. [¶] Furthermore, Ms. [H.] one of the victims was called numerous times by [petitioner].

> She did not accept calls after speaking with him on two or three occasions. On her call blocker i.d. it would state, I believe, custodial facility or jail. I'm not sure which. So he has made numerous attempts to contact them.

RT 2A:18–3A–1, 37:28–38:4. Petitioner's standby counsel similarly explained: "I think the Sheriff's procedure is once they are made aware that victims have been contacted [by the petitioner] they did search his cell and take things from his cell. And then I believe they do not permit people who do that to [go to] the [law] library." RT 37:28–38:4.

RT 1:15–3:1, and Judge Bowers denied his request, reminding petitioner he had "announced ready to proceed ... [and the court] takes you at your word." RT 3:2–9, 4:7–9:7, 14:14–18:1. Then petitioner stated he "would like to give up [his] pro per status[,]" and the trial court stated it would allow that but standby counsel would, nevertheless, have to start trial on May 16, 2005. RT 24:11–30:23. The petitioner then decided not to relinquish his *pro se* status at that time. RT 39–13:21.

 The petitioner's due process claim is without merit because petitioner has not shown he was prejudiced by the trial court's denial of his requests for a continuance of the trial. *See Gallego v. McDaniel,* 124 F.3d 1065, 1072 (9th Cir. 1997) (habeas relief may be granted only if there is a showing of actual prejudice to defense resulting from trial court's refusal to grant continuance), *cert. denied,* 524 U.S. 917, 118 S.Ct. 2299, 141 L.Ed.2d 159 (1998) and 524 U.S. 922, 118 S.Ct. 2311, 141 L.Ed.2d 169 (1998); *Armant v. Marquez,* 772 F.2d 552, 556–57 (9th Cir.1985) ("At a minimum, ... in order to succeed the [petitioner] must show some prejudice resulting from the court's denial" of his motion for a continuance.), *cert. denied,* 475 U.S. 1099, 106 S.Ct. 1502, 89 L.Ed.2d 902 (1986). For the same reason, the California Court of Appeal's determination that any error in failing to grant a continuance of the trial "was harmless in light of the abundant evidence of petitioner's guilt" and because petitioner "has not demonstrated a reasonable probability of a different outcome had the requested continuances been granted[,]" Lodgment, Exh. C at 24, was not an objectively unreasonable application of harmless error review. *See Mitchell v. Esparza,* 540 U.S. 12, 18, 124 S.Ct. 7, 12, 157 L.Ed.2d 263 (2003) (per curiam) (Upon federal habeas review, state court harmless error determinations must be analyzed to determine whether the state court "applied harmless-error review in an 'objectively unreasonable' manner."); *Inthavong v. Lamarque,* 420 F.3d 1055, 1058–59 (9th Cir.2005) (Under AEDPA, "we must defer to [the state court's harmless error] holding unless it was in conflict with the reasoning or the holdings of [Supreme Court] precedent or if it applied harmless-error review in an objectively unreasonable manner." (citations and internal quotation marks omitted)), *cert. denied,* 547 U.S. 1059, 126 S.Ct. 1660, 164 L.Ed.2d 403 (2006). Therefore, the California Supreme Court's denial of Ground Two was neither contrary to, nor an unreasonable application of, clearly established federal law.

## VI

 "The right to an impartial jury is guaranteed by both the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, and by principles of due process." *Turner v. Murray,* 476 U.S. 28, 36 n. 9, 106 S.Ct. 1683, 1688 n. 9, 90 L.Ed.2d 27 (1986). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); *Morgan v. Illinois,* 504 U.S. 719, 727, 112 S.Ct. 2222, 2228, 119 L.Ed.2d 492 (1992); *see also Sheppard v. Maxwell,* 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600, 384 U.S. 333 (1966) ("Due process requires that the accused receive a trial by an impartial jury free from outside influences.").

 "The bias or prejudice of even a single juror would violate [the] right to a fair trial." *Dyer v. Calderon,* 151 F.3d 970, 973 (9th Cir.) (en banc), *cert. denied,* 525 U.S. 1033, 119 S.Ct. 575, 142 L.Ed.2d 479 (1998); *Estrada v. Scribner,* 512 F.3d

1227, 1239–40 (9th Cir.), *cert. denied*, 554 U.S. 925, 128 S.Ct. 2973, 171 L.Ed.2d 898 (2008). The Ninth Circuit has identified three theories of juror bias: "so called *McDonough*-style bias,[12] which turns on the truthfulness of a juror's responses on voir dire; actual bias, which stems from a pre-set disposition not to decide an issue impartially; and implied (or presumptive) bias, which may exist in exceptional circumstances where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury." *Fields v. Brown*, 503 F.3d 755, 766–70 (9th Cir.2007) (en banc) (footnote omitted; footnote added), *cert. denied*, 552 U.S. 1314, 128 S.Ct. 1875, 170 L.Ed.2d 752 (2008).

In Ground Three, petitioner claims his constitutional rights were violated when Juror no. 12 was allowed to serve on the jury despite being an Amtrak employee. There is no merit to this claim.

The factual basis for this claim is as follows: During *voir dire*, Juror no. 12 introduced himself by stating: "I'm a resident of Alhambra, I have been for over 25 years. [¶] I work for Amtrak railroad...." ART 140:13–16, 182:6. Petitioner, who was then representing himself, did **not** exercise a peremptory challenge against Juror no. 12[13] or seek to excuse Juror no. 12 for cause; rather, petitioner accepted the jury with Juror no. 12. ART 182:8–183:13. After opening statements, Juror no. 12 again informed the court and counsel that he was an Amtrak employee, and he also stated that he remembered "there were assaults at Union Station [and] they put out an employee advisory that had a general description [of a suspect] and called for tightening of our internal security" and he "knows all of the areas, the parking structure, the Union Station, the grounds [since] I've been working there for almost 30 years." RT 112:21–115:9. The general description of the assailant was of "a male, African–American, and a height[,]" and Juror no. 12 did not equate petitioner with that description. RT 117:10–118:4. Juror no. 12 also stated the information he had would not negatively impact his ability to serve as a juror. RT 114:8–25, 117:26–118:27. The trial court implicitly determined Juror no. 12 was fit to serve and allowed him to remain. RT 118:13–27. Similarly, defense counsel, who now was representing petitioner after he had relinquished his *Faretta* status, did not move to dismiss Juror no. 12; rather, she stated: "I like this juror, I don't want to lose him." RT 116:25–26.

The Superior Court denied petitioner's claim of juror bias, which was raised in one of petitioner's habeas corpus petitions, stating:

> A claim of concealment of material information by a juror on voir dire is a cognizable habeas corpus claim. However, no concealment of facts was committed by this juror. Based upon the representations made in the petition by this petitioner, the juror was honest with the court and simply allowed to stay on the jury. As a result, this court finds that no juror misconduct occurred, and the petition must be denied on this basis.

Lodgment, Exh. MM at 3–4 (citation omitted).

Here, there was no *McDonough*-type bias since Juror no. 12 clearly disclosed his employment with Amtrak to the trial court

---

**12.** *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984).

**13.** Petitioner had peremptory challenges left after Juror no. 12 was seated. ART 182:8–183:13.

and parties during *voir dire*. *See McDonough Power Equip., Inc.*, 464 U.S. at 556, 104 S.Ct. at 850 ("[T]o obtain a new trial ..., a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause."). Additionally, petitioner has not shown Juror no. 12 was actually biased. *See Estrada*, 512 F.3d at 1240 ("Actual bias is, in essence, 'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality.'" (citation omitted)); *Fields*, 503 F.3d at 767–68 (There was no actual bias when juror "did not confuse [similar] events with what he had to decide about [defendant]. He truthfully represented that he was impartial. He did not lie to conceal bias.").

■ What remains is to determine whether this Court should presume Juror no. 12's bias based on the circumstances of petitioner's case. *Estrada*, 512 F.3d at 1240; *see also Fields*, 503 F.3d at 770 (Bias has been presumed "in those extreme situations 'where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances,' or where repeated lies in voir dire imply that the juror concealed material facts in order to secure a spot on the particular jury[.]") (citations omitted). Juror bias may be presumed or implied "where the juror is apprised of such prejudicial information about the defendant that the court deems it highly unlikely that he can exercise independent judgment even if the juror states he will...." *Estrada*, 512 F.3d at 1240 (citation omitted). "The standard is 'essentially an objective one,' under which a juror may be presumed biased even though the juror himself believes or states that he can be impartial." *Fields*, 503 F.3d at 770

(citations omitted). Here, this Court "decline[s] to find implied bias from ... [the] juror's employment alone even where closely related to the substance of the case." *Tinsley v. Borg*, 895 F.2d 520, 529 (9th Cir.1990), *cert. denied*, 498 U.S. 1091, 111 S.Ct. 974, 112 L.Ed.2d 1059 (1991); *United States v. Olano*, 62 F.3d 1180, 1192 (9th Cir.1995), *cert. denied*, 519 U.S. 931, 117 S.Ct. 303, 136 L.Ed.2d 221 (1996); *see also United States v. Plache*, 913 F.2d 1375, 1378 (9th Cir.1990) ("In the absence of any persuasive additional factors, [the juror's] employment status alone does not warrant a finding of implied bias."); *Fields*, 503 F.3d at 773 (no implied bias when juror was honest on voir dire). Accordingly, the Superior Court's denial of Ground Three was neither contrary to, nor an unreasonable application, of clearly established federal law.

## VII

■ In Ground Six, petitioner protests the Thirteenth Amendment and claims his convictions are manifestly unjust because he "was falsely convicted" and the trial court and prosecution "obstructed justice." SAP at 7. However, "[c]onclusory allegations ... [that] are not supported by a statement of specific facts do not warrant habeas relief." *James v. Borg*, 24 F.3d 20, 26 (9th Cir.), *cert. denied*, 513 U.S. 935, 115 S.Ct. 333, 130 L.Ed.2d 291 (1994); *Jones v. Gomez*, 66 F.3d 199, 204–05 & n. 1 (9th Cir.1995), *cert. denied*, 517 U.S. 1143, 116 S.Ct. 1437, 134 L.Ed.2d 559 (1996).

## RECOMMENDATION

IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting this Report and Recommendation; (2) adopting the Report and Recommendation as the findings of fact and conclusions of law herein; and (3) directing that Judgment be entered denying the pe-

tition and dismissing the action with prejudice.

DATE April 22, 2010.